UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| EPPS CHEVROLET COMPANY, d/b/a | ) | |
| TOM EPPS NISSAN, | ) | |
| | ) | Civil No: 14-40-GFVT |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| NISSAN NORTH AMERICA, INC., | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Epps Chevrolet Company, d/b/a Tom Epps Nissan, was a party to a Dealer

Agreement with defendant Nissan North America, which authorizes Epps to operate a Nissan

dealership in Middlesboro, Kentucky.  When Epps' lendor repossessed its inventory, Nissan

served Epps with a Notice of Termination.  Shortly afterward, Epps submitted a proposed Asset

Purchase Agreement for Nissan's evaluation and consent.  Nissan ultimately terminated the

Agreement and declined to continue to consider the proposed transfer agreement.  Epps then

filed this lawsuit, alleging breach of contract and violation of the Kentucky Motor Vehicles Act

and the federal Automobile Dealer's Day in Court Act, as well as several common law tort

claims.  Nissan filed a Motion to Dismiss the complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the Court will

GRANT Nissan's motion.

I

From 1971 until 2013, Plaintiff Epps Chevrolet Company operated a dealership in

Middlesboro, Kentucky selling automobiles manufactured by Nissan or its predecessor, Datsun. [First Amended Compl., R. 10 at ¶ 5]. The dealership, which is owned by Thomas and Dale Epperson, entered into a Dealer Agreement that authorized Epps to sell new Nissan vehicles and required Epps to, among other things, establish and maintain wholesale financing arrangements, remain solvent, and ensure that the dealership facilities remain open during normal business hours. [*See* Dealer Agreement, R. 15-3]. In late 2012 and early 2013, Epps began experiencing financial difficulties and entered into a forbearance agreement with its lendor, Community Trust Bank. [First Amended Compl., R. 10 at ¶ 6]. After Epps apparently defaulted on that agreement (which Epps disputes), Community Trust repossessed substantially all of Epps' motor vehicle inventory on Friday, April 5, 2013. [*Id.*]

Three days later, Drew Starke, Nissan's regional Dealer Operations Manager, visited the dealership and met with Dale Epperson, a manager and minority owner of the dealership. According to the complaint, Starke represented to Epperson that because of the repossession, Nissan would be sending Epps a letter containing a Notice of Termination, but that "there was no need to 'worry about the termination letter.'" [First Amended Compl., R. 10 at ¶ 8]. Starke also allegedly represented that, "despite the anticipated termination letter, . . . [Epps] would have a period of ninety (90) days in which to sell the Franchise." [*Id.* at ¶ 9].

On April 16, Nissan sent Epps a Notice of Termination letter, which, by its own terms, served as "formal notice of its intent to terminate the Agreement . . . effective [at] 5:00 pm on the latter occurring of either May 1, 2013, or fifteen (15) days from receipt hereof." [R. 14-1]. After some apparent issues with delivery, Epps received this letter on April 30. [R. 14-1 at 5].

Ten days earlier, Epperson entered into an Asset Purchase Agreement with Tim Short of Tim Short Motors, LLC. [First Amended Compl., R. 10 at ¶¶ 11-12]. In accordance with the

Dealer Agreement, which requires a dealer to obtain Nissan's consent before a transfer agreement can be effective, [*see* Dealer Agr. at ¶ 16(B)], Epperson communicated the planned sale to Drew Starke, who referred him to Matt Nyenhuis, Nissan's Manager of Dealer Network Development.  On May 1, Nyenhuis sent a letter to Epperson and Short stating that Nissan was in receipt of the proposed transfer agreement and that an email requesting several documents required for the evaluation would be forthcoming.  [First Amended Compl., R. 10 at ¶ 13].  Two days later, Stephanie Stewart, a Dealer Network Specialist who worked with Nyenhuis, emailed Epperson and Short a Document Request Letter, which contained a number of attachments and forms, some of which were identified as "more urgent."  [*Id.* at ¶ 14].  Epperson and Short completed and forwarded several of the requested documents to Nissan, including a Voluntary Termination Letter, which Epperson mailed on May 6.  [*Id.* at ¶ 14, 15].  Epperson contacted Stewart "at least twice" during this period to inquire into the progress of the evaluation; according to the complaint, Stewart stated that most of the outstanding documents were "needed from the prospective buyer [Short] and that she would be getting in touch with him [Epperson]" after those were received.  [*Id.* at ¶ 15].

Despite the exchange of the sale documents, on May 16, 2013, Dale Epperson received a letter from Nissan stating that, "pursuant to the Notice of Termination letter dated April 16, 2013," the termination of the Agreement had become finally effective "as of May 8, 2013."  [*Id.* at ¶ 17].  This, Epps alleges, was its first indication that Nissan "considered the April 16 [Notice of Termination] Letter to be still in effect or otherwise a potential roadblock to its approval of the Franchise's sale."  [*Id.*]  Shortly afterward, Nissan notified Tim Short that it had ceased considering the proposed transfer.  [*Id.* at ¶ 18].

Pursuant to the Kentucky Motor Vehicle Act, Kentucky Revised Statute (KRS) § 190.010 *et seq.*, Epps filed a protest claim with the Kentucky Motor Vehicle Commission on May 23, twenty-three days after the Notice of Termination was issued upon the dealership.  [Ky. Motor Vehicle Commission Order, R. 14-4 at ¶ 1].  The Act, however, requires that any protest must be filed within fifteen days of service of a Notice of Termination. KRS § 190.045(1).  Epps argued before the Commission that the statute of limitations was tolled because Nissan had withdrawn, waived or extended the Notice of Termination.  After an evidentiary hearing, the Commission found that Nissan made no written or verbal withdrawal of the Notice and that Nissan's acceptance and review of the proposed transfer agreement "[did] not, in and of itself, waive, revoke or extend the notice of termination issued to Epps. . . ."  [Ky. Motor Vehicle Commission Order, R. 14-4 at ¶ 9]. It therefore dismissed Epps' protest as untimely.  [*Id.*]  Pursuant to the KMVA, Epps appealed that Order to the Franklin Circuit Court for judicial review.  In status reports ordered by the Court on February 24, 2015 [R. 24], the parties advised that the appeal remains pending; no briefing schedule has been entered and no other action has yet taken place in that case.  [R. 25, 26].

Epps filed the instant suit on April 3, 2014 in Franklin Circuit Court, alleging breach of contract, violation of the KMVA and federal Automobile Dealer's Day in Court Act, and breach of the UCC's covenant of good faith and fair dealing, as well as intentional interference with contractual relations, fraud, negligent misrepresentation, and fraud by omission.  [R. 1-1; R. 10].  Nissan removed the action, [R. 1], then filed the instant Motion to Dismiss.  [R. 5].

II

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a complaint which fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

4

Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, as is now well known, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a plaintiff need not provide "detailed factual allegations," she must advance more than "a formulaic recitation of the elements of a cause of action."  *Id.* (citing *Twombly*, 550 U.S. at 555).  A court reviewing a 12(b)(6) motion must "accept all the Plaintiffs' factual allegations as true and construe the complaint in the light most favorable to the Plaintiffs," *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005), but it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Ultimately, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

At the outset, the Court notes that Epps did not include the Notice of Termination, the Asset Purchase Agreement, or the Dealer Agreement with its initial Complaint, [R. 1], or its First Amended Complaint, [R. 10].  Generally, a court may not refer to matters outside of the pleadings without converting a motion to dismiss into a motion for summary judgment, Fed. R. Civ. P. 12(d), and a plaintiff is under no obligation to attach to his complaint the documents upon which his cause of actions are based, *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (citing 5 Charles A. Wright, et al., Fed. Practice & Procedure § 1327 (2d ed. 1990)).  The Sixth Circuit has held, however, that a defendant may attach as exhibits the documents that are "referred to in the plaintiff's complaint and are central to [its] claim" without converting a motion to dismiss into one for summary judgment.  *Weiner*, 108 F.3d at 89; *see also KBC Asset*

*Mgmt. N.V. v. Omnicare, Inc.* (*In re* Omnicare, Inc. Sec. Litig.), 769 F.3d 455, 466 (6th Cir.

2014).  The contracts and correspondence attached to Nissan's motion are essential for each of

Epps' claims, though they were not attached by the plaintiff.  Accordingly, the Court refers to

and considers these documents throughout this opinion without triggering the summary judgment

standard.

A

Nissan first challenges Epps' claims for breach of contract, violation of the KMVA, and

the implied covenant of good faith and fair dealing.  Epps does not cite any particular provisions

of the contract in its complaint.  [*See* First Amended Compl., R. 10 at ¶¶ 22-24].  However,

allowing all reasonable inferences in Epps' favor, it ostensibly offers four bases for these claims.

First, the complaint alleges that Nissan "unreasonably and unlawfully ceas[ed] to consider and

refus[ed] to permit" the proposed transfer once the final termination became effective.  [*Id.* at ¶

20; *see also id.* at ¶ 19].  To borrow the language of the KMVA, this allegation contends that

Nissan "unreasonably withheld" its consent to the proposed transfer in violation of Kentucky law

and in breach of the dealer agreement.  *See* KRS § 190.047(2).  Second, Epps' ostensibly sets

forth a contract claim based on the theory of equitable estoppel or, in the alternative, waiver –

issues that were raised before the Kentucky Motor Vehicle Commission.  [*Id.* at ¶ 8, 19]. Third,

Epps alleges that, after termination of the agreement, Nissan acted "unreasonably and

unlawfully" with regard to certain post-termination duties under the contract.  [*Id.* at ¶ 20].

Finally, in a separate count, Epps contends that Nissan's actions breached the covenant of good

faith and fair dealing under the Uniform Commercial Code.  [*Id.* at ¶ 36-39].

1

Nissan argues that Epps cannot state a claim for violation of the transfer provisions of the KMVA and the contract. It argues that, as a matter of law, it had no contractual or statutory obligation to continue considering the proposed transfer after the final termination of the agreement. Without any such obligation, Nissan claims, it cannot be said that it unreasonably withheld consent to the proposed transfer in violation of the contract or the statute.

The KMVA sets forth a detailed set of requirements and administrative mechanisms for proposed transfers and termination of a dealership agreement. KRS §§ 190.045, 190.047. Under the Act, a dealer must submit a written proposal to the manufacturer and obtain the manufacturer's written consent prior to transferring a franchise agreement. KRS § 190.047(1). The Act provides that "approval of the proposal shall not be arbitrarily or unreasonably withheld" by the manufacturer. KRS § 190.047(2); *see also* KRS § 190.070(2)(m) (providing that a manufacturer may not "fail to give consent to the sale, transfer, or exchange of the franchise to a qualified buyer capable of being licensed as a new motor vehicle dealer in this state; provided that consent may be withheld when in light of other circumstances, granting the consent would be unreasonable"). The Nissan-Epps dealer agreement in the present case similarly provides that Nissan may not "unreasonably withhold consent" to a proposed change of ownership. [Dealer Agreement, R. 15-3 at ¶ 12(a)(1)]. The Act does not prescribe a particular length of time in which the manufacturer may consider a proposed transfer, but the Dealer Agreement provides that Nissan has sixty days to evaluate a proposed transfer. [*Id.* at ¶ 16(B)].[1]

---

[1] The KMVA also prescribes the termination process. KRS § 190.045. In Kentucky, a manufacturer can terminate a dealer's franchise if it has issued a Notice of Termination, "has good cause for the termination, and acts in good faith," i.e., with honesty and in accordance with reasonable commercial standards of fair dealing. KRS § 190.045(1)(a)-(c) (cross referencing KRS § 190.010(22)). When, as here, termination is based on the dealer's insolvency or failure to maintain customary sales and service operations, manufacturer must submit the Notice of Termination to the dealer "not less than fifteen (15) days prior to the effective date of a termination." KRS §

Kentucky courts have not yet defined what conduct amounts to an unreasonable withholding of consent by a manufacturer.  However, the vast majority of courts considering this issue agree that, where there is no contractual or statutory obligation to respond or render its consent in the applicable timeframe, it cannot be said that a franchisor has unreasonably withheld its consent.  *See, e.g.*, *South Shore Imported Cars, Inc. v. Volkswagen of Am., Inc*., 439 Fed. App'x 7, 10 (1st Cir. 2011) (Souter, J., sitting by designation) (unpublished) (affirming summary judgment for manufacturer because, as a matter of law, the manufacturer's obligation to consider the proposed transfer "cannot be applied" to a dealer's request made after a notice of termination); *Mount Clemens Auto Ctr. Inc. v. Hyundai Motor Am*., 897 F. Supp. 2d 570 (E.D. Mich. 2012); *H-D Mich., LLC v. Sovie's Cycle Shop, Inc*., 626 F. Supp. 2d 274 (N.D.N.Y 2009) (in a converted motion for summary judgment, dismissing counterclaim for breach of contract and analogous statute since it was not unreasonable for manufacturer to refuse a transfer request after the franchise was already the subject of a termination notice); *Maple Shade Motor Corp. v. Kia Motors Am., Inc.*, 2006 U.S. Dist. LEXIS 58569, 2006 WL 2320705 (D.N.J. Aug. 8, 2006); *David Glen, Inc. v. Saab Cars USA*, 837 F. Supp. 888 (N.D. Ill. 1993) (denying petition for temporary restraining order enjoining termination since the dealer did not submit a transfer proposal to the manufacturer until after it received a notice of termination); *cf. Chic Miller's Chevrolet, Inc. v. General Motors Corp.*, 352 F. Supp. 2d 251 (D. Conn. 2005) (granting summary judgment where franchisee's transfer request was made after dealer agreement was finally terminated).

In these cases, a proposed transfer was filed with the manufacturer after a notice of termination was served but before the final termination of the agreement became effective.

---

190.045(4)(c)(1)-(2).  Epps' complaint sets forth no allegation disputing Nissan's grounds for termination, but focuses only on the four above-described bases for its breach of contract claims.

Confronted with similar dealer agreements and statutory schemes that are nearly identical to Kentucky's, these courts reason that once an agreement is finally terminated, the manufacturer's obligations under the contract cease and nothing requires that it continue to consider, much less outright approve, of the transfer. *E.g.*, *South Shore*, 2010 U.S. Dist. LEXIS 26520, *18 (D. Mass Mar. 22, 2010) (emphasis in original) (trial court opinion) ("While it is clear from the plain language of both the statute and the Dealer Agreement that [the manufacturer] was obligated to consider in good faith any proposed assignee . . . *so long as the franchise agreement was in full force and effect*, the condition precedent no longer attached after delivery of the Termination Notice."). As such, a dealer cannot claim that a manufacturer has a continuing duty to "exercise due diligence and come to a decision [on a proposed transfer] . . . beyond the effective period of the franchise agreement." *South Shore*, 439 Fed. App'x at 10. In other words, where an agreement's effective termination is due to occur before a manufacturer's time for review of the transfer elapses, these courts hold that – as a matter of law – a manufacturer has not unreasonably withheld consent. *E.g.*, *Mount Clemens*, 897 F. Supp. 2d at 578 ("Because it had no obligation to consent to the proposed transfer prior to the termination of the agreement, [the manufacturer] could not have unreasonably withheld its consent."); *H-D Mich.*, 626 F. Supp. 2d at 279 ("It is not unreasonable to refuse to approve the transfer of a franchise that is in the process of being terminated.").

In *Mount Clemens*, for instance, our sister court confronted this issue in the context of a similar Michigan statute and dealer agreement. 897 F. Supp. 2d 570. There, the dealer submitted a proposed purchase agreement on January 24, 2012, after a Notice of Termination had already been issued. *Id.* at 573. While the agreement was silent as to the deadline for the manufacturer's consent to the transfer, the applicable Michigan statute allowed a manufacturer

9

sixty days to respond to a proposal. *Id.* at 578 (citing Mich. Comp. Laws § 445.1574(1)(l)). That sixty-day period would not have expired until well after the effective termination date of February 1. The Court held that, since the manufacturer had no obligation to give its consent in the period prior to the termination of the agreement, "[the manufacturer] could not have unreasonably withheld its consent" in the six days prior to final termination. *Id.* at 578. Moreover, the dealer had not pleaded any facts to show that the manufacturer's conduct was unreasonable or in bad faith. *Id.* The Court therefore granted the manufacturer's motion for judgment on the pleadings.

The facts here are not dissimilar. Epperson and Tim Short communicated their proposed transfer contract to Nissan via email on April 20. [*See* First Amended Compl., R. 10 at ¶¶ 11-12]. Accepting those facts as true, at the earliest, the sixty-day deadline for Nissan to respond to the proposed transfer would have been June 20. Although each party makes different representations about the exact date of the final termination, it occurred – at the latest – on May 16, 2013.[2] Much like the manufacturer in *Mount Clemens*, Nissan could not have unreasonably withheld its consent in this twenty-six day interim because – after the contract and all obligations under it were finally terminated – it had no obligation to give its consent at all. *Mount Clemens*, 897 F. Supp. 2d at 578.

It cannot be reasonably inferred from the facts as alleged that Nissan unreasonably withheld its consent to the proposed transfer. Epps has pled that Nissan – not unlike the manufacturers in *Mount Clemens*, *South Shore*, and the rest of the prevailing case law – sent a

---

[2] Nissan apparently considered May 8 to be the effective termination date. [R. 20-1]. The Notice of Termination states that the effective termination date is "the later occurring of either May 1, 2013 or fifteen (15) days from receipt hereof." [R. 14-1 at 1]. According to certified mail receipts, Epps did not receive the Notice until April 30, 2013. [R. 14-1 at 5]. As such, it would appear that the effective termination would have been May 16, fifteen days after April 30. In any event, the dispute over the precise final termination date is inconsequential, since it is clear that it occurred at least thirty days before Nissan's sixty-day period for review of the proposed transfer would have elapsed.

Notice of Termination, accepted a proposed transfer agreement, and allowed the contract to expire without affirmatively consenting to the transfer.  [*See* First Amended Compl., R. 10 at ¶¶ 10, 11-12, 17].  This is, as a matter of law, insufficient to establish that Nissan unreasonably withheld its consent within the meaning of the dealer agreement or the KMVA.  *E.g.*, *Mount Clemens*, 897 F. Supp. 2d at 578; *H-D Mich.*, 626 F. Supp. 2d at 279.  Without any facts of bad faith or arbitrary conduct *relevant the transfer evaluation process*,[3] Epps has not stated a claim for breach of contract and violation of the KMVA for unreasonably withheld consent.

2

Granting all inferences in Epps' favor, the First Amended Complaint alleges that Nissan waived or withdrew the Notice of Termination when it accepted Epps' proposed transfer materials for its consideration.  According to Epps, Nissan is therefore equitably estopped from relying on the Notice of Termination.  [*See* First Amended Compl., R. 10 at ¶ 8, 19-20].  Nissan, however, claims that this argument is precluded by collateral estoppel, since Epps raised this issue before the Kentucky Motor Vehicle Commission.

Under the Full Faith and Credit Clause and the principles of federalism underlying the federal Constitution, "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' . . . federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts."  *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986) (citing *Utah Constr. & Mining Co.*, *384* U.S. 394, 422 (1966)); *Kremer v. Chem. Const. Corp.*, 456 U.S.

---

[3] The complaint does allege that Nissan's representative told Epperson that he did not have to worry about the Notice of Termination letter, [Compl. at ¶ 8], and that Nissan sent the final notice of termination after the protest period had elapsed, [Compl. at ¶ 19].  But these facts relating to termination – even when accepted as true – do not support any reasonable inference that Nissan unreasonably refused to approve of the transfer agreement with Short.  Those factual allegations are considered below in the context of Epps' equitable estoppel and waiver theory.

461, 483 (1982).  Kentucky courts have held that the principles of res judicata and collateral

estoppel apply equally to administrative decisions.  *E.g.*, *Herrera v. Churchill McGee*, 680 F.3d

539, 547 (6th Cir. 2012).  Because Nissan is seeking to avoid the relitigation of an issue – Epps'

waiver and estoppel argument – and not the relitigation of a previously adjudicated cause of

action, Kentucky's collateral estoppel rules apply here. *Miller v. Admin. Office of Courts*, 361

S.W.3d 867, 871-73 (Ky. 2011).  The essential elements of collateral estoppel, also known as

issue preclusion, are: "(1) identity of issues; (2) a final decision or judgment on the merits; (3) a

necessary issue with the estopped party given a full and fair opportunity to litigate; (4) a prior

losing litigant."  *Moore v. Cabinet for Human Res.*, 954 S.W.2d 317, 319 (Ky. 1997).

Before the Commission, Epps argued that its late-filed protest claim should be deemed

timely because Nissan waived its Notice of Termination when it accepted and reviewed Epps'

proposed transfer agreement.  [Ky. Motor Vehicle Comm'n Order, R. 14-4 at 1 (identifying the

issue before it as "whether or not a Notice of Termination issued by Nissan Motors was

withdrawn, waived or extended as it related to Epps Chevrolet Company, Inc.")].  This waiver,

Epps argued, estopped Nissan from relying on the Notice as proper grounds for a final

termination.  Epps makes the identical argument here. [*E.g.*, First Amended Compl. at ¶ 19; Pl.'s

Mot. Dismiss, R. 20 at 13-14, 18-19].  This was a necessary issue for the Commission's

determination, since it is without jurisdiction to hear protest claims unless they are timely filed as

prescribed by KRS § 190.045(1)(d).  *See, e.g.*, *Dennis v. Fiscal Court of Bullitt County*, 784

S.W.2d 608, 609 (Ky. Ct. App. 1990) ("[T]he dismissal of a pending action based on a failure to

comply with the applicable statute of limitations operates as a judgment on the merits for res

judicata purposes."); [Ky. Motor Vehicle Comm'n Order, R. 14-4 at 3].

Epps contends that these issues are not identical since the Commission's determination was made in the context of tolling the statute of limitations, while this Court's assessment would relate to a breach of contract claim.  [R. 23-2].  However, the same factual and legal analysis governs both determinations.  Restatement (Second) of Judgments § 27, cmt. c (noting that preclusion is often warranted where there is "substantial overlap" between the factual assessments and where the "argument involve[s] application of the same rule of law as that involved in the prior proceeding").  This Court, like the Commission, would be required to consider the nature and effect of the contract and whether any withdrawal took place on the facts of the case.  Any determination this Court might reach would ultimately relate to the legal effect of Notice of Termination – a determination that the Commission has already made.  *See id.* ("Preclusion ordinarily is proper if the question is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action.").

The finality requirement is also satisfied, despite the fact that Epps' appeal for judicial review of the Commission's decision is still pending before the Franklin Circuit Court.  This is because Kentucky follows the federal common law rule[4] that "the pendency of an appeal does not destroy the finality of the judgment for the purposes of issue preclusion . . . ."  *Stemler v. City of Florence*, 126 F.3d 856, 871 (6th Cir. 1997) (citing *Roberts v. Wilcox*, 805 S.W.2d 152, 153

---

[4] Often cited is the Supreme Court's decision in *Deposit Bank v. Frankfort*, 191 U.S. 499, 519 (1903), which "establish[ed] the rule that a final judgment retains all of its res judicata consequences pending decision of the appeal, apart from the virtually nonexistent situation in which the 'appeal' actually involves a full trial de novo." 18A Charles A. Wright, et al., Federal Practice & Procedure § 4433 (2d ed. 1990); *see also, e.g.*, *Smith v. S.E.C.*, 129 F.3d 356, 363 (6th Cir. 1997) (citing Restatement (Second) of Judgments § 13, cmt. f (1982)) ("The fact that [the plaintiff] has an appeal of [a state court criminal] judgment pending does not deprive the judgment of res judicata effect [in the federal court securities action].");  *Smith v. Metro. Dev. Hous. Agency*, 857 F. Supp. 597, 599-600 (M.D. Tenn. 1994).  The fact that the state court decision may subsequently be reversed does not preclude the application of this rule.  9 A.L.R.2d 984 (1950) (citations omitted) (noting that this rule and its countervailing authorities both have undesirable consequences, and that "[t]he evil resulting from [the Kentucky] rule is said to be that "though the judgment is erroneous, and for that reason is reversed, yet before the reversal it may be used as evidence, and thereby lead to another judgment, from which it may be impossible to obtain relief notwithstanding such reversal.").

13

(Ky. Ct. App. 1991)); *see also Suiter v. Logan Cnty.*, No. 1:12-CV-00155-JHM, 2012 WL 6645699, *2 (W.D. Ky. Dec. 20, 2012) (holding that, where state trial court's order on plaintiff's sexual harassment claim was pending when she filed suit in federal court, Kentucky law required issue preclusion); *Houchin v. Allstate Indem. Ins. Co.*, No. 4:07-CV-00071-M, 2012 WL 2430474, *3 (W.D. Ky. June 26, 2012) (holding that, under Kentucky law, appealed conviction for arson in state court did not defeat issue preclusion in federal court insurance case arising from same facts).[5]

Accordingly, under the doctrine of issue preclusion, the Court takes notice of the Commission's decision in reaching its determination on Nissan's Motion to Dismiss,[6] and finds that the Commission's decision is binding as to Epps' claims for breach of contract and violation of the KMVA.  The Commission found that Nissan had not waived, withdrawn, or extended the Notice of Termination.  [Ky. Motor Vehicle Comm'n Order, R. 14-4 at 3].  As such, Epps' waiver/estoppel argument is unavailing, and Nissan may rely on the Notice of Termination in its arguments in support of its Motion to Dismiss.  Epps' equitable estoppel and waiver theories for breach of contract must be dismissed.

---

[5] While Kentucky has apparently not yet applied this rule to pending review of state agency decisions, the Kentucky Supreme Court has made clear that "[d]ecisions of administrative agencies acting in a judicial capacity are entitled to the same res judicata effect as judgments of a court."  *Ky. Bar Ass'n v. Harris*, 269 S.W.3d 414, 418 (Ky. 2008) (citing *Godbey v. Univ. Hosp. of the Albert B. Chandler Med. Ctr., Inc.*, 975 S.W.2d 104, 105 (Ky.Ct.App. 1998)). Moreover, under the federal courts' application of this finality rule, "an initial decision after a full adjudicatory proceeding should be denied preclusive effect if an appeal is pending before officials who are responsible for reaching an essentially de novo decision on the hearing record."  18B Charles A. Wright, et al., Fed. Practice & Procedure § 4475 (2d ed. 1990).  Here, however, Kentucky administrative law provides that the Franklin Circuit Court's judicial review is limited to a substantial evidence standard – not a full de novo standard.  *E.g.*, *Iles v. Kentucky*, 320 S.W.3d 107, 111 (Ky. Ct. App. 2010); *see* KRS § 13B.140.  Finally, it should be noted that no action has taken place in the Franklin Circuit Court case.  *See* Wright, *supra*, at § 4433 ("The bare act of taking an appeal is no more effective to defeat preclusion than a failure to appeal.").

[6] *E.g.*, *LG Elecs. U.S.A., Inc. v. Whirlpool Corp*., 2011 U.S. Dist. LEXIS 111059, *10, 2011 WL 4543886 (D. Del. Sept. 29, 2011) (citing *Toscano v. Connecticut General Life Ins. Co.*, 288 Fed. Appx. 36, 37-38 (3d Cir. 2008)). ("Although the court may not generally consider evidence beyond the complaint in deciding a Rule 12(b)(6) motion, when a motion to dismiss is based upon the defense of claim preclusion, the court may take judicial notice of the record in the [other] action in reaching its determination on LG's motions to dismiss.").

3

The complaint also alleges that Nissan breached the post-termination provisions of the Dealer Agreement, including "a) the manner in which it took possession of Epps' [] new motor vehicle inventory; b) failing to credit the account of Epps Nissan appropriately; and c) failing and refusing to purchase the Parts despite Epps['] demand for same."  [First Amended Compl., R. 10 at ¶ 20].  But Epps has pled no factual content relating to these post-termination events; instead, it merely pleads the above conclusory allegations, which the Court is not bound to accept.  *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  With such a bare allegation, the Court is left to guess how – if at all – Nissan might have breached these provisions.  Although Epps has failed to state a claim for breach of these post-termination contract terms, it will be afforded an opportunity to amend its complaint as to this claim.

4

Epps next alleges that Nissan breached the covenant of good faith and fair dealing when it terminated the Dealership Agreement and ceased to continue considering the proposed transfer after the effective termination date.  While a claim for breach of the covenant of good faith and fair dealing cannot stand alone as an independent cause of action, it may be asserted as a claim for breach of an implied term of a contract.  *E.g.*, *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629, 634 (E.D. Ky. 2012), *aff'd*, 751 F.3d 434 (6th Cir. 2014) (citations omitted) ("Kentucky law does impose an obligation of good faith in the performance of any contract [but] it does not create an independent cause of action.").

The facts alleged in the complaint, however, cannot support a reasonable inference that Nissan acted in bad faith when it exercised its contractual rights to terminate the agreement or to

decline to approve of a proposed transfer.  Kentucky law provides that the implied covenant of good faith "does not preclude a party from enforcing the terms of the contract."  *Hunt Enters. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700, 1997 U.S. Dist. LEXIS 23151, 6 (W.D. Ky. 1997) (quoting *Travelers Ins. Co. v. Corporex Properties, Inc.*, 798 F. Supp. 423, 425 (E.D. Ky. 1992)).  Indeed, "[i]t is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained."  *Id.*  In *Hunt*, a manufacturer exercised its contractual right to terminate a John Deere equipment franchise agreement, even though a proposed transfer agreement had been pending before it.  The plaintiff-dealer claimed that the manufacturer breached the implied covenant when it terminated the dealership agreement and refused to approve the proposed sale.  The Court held that, since the manufacturer's conduct was done in accordance with the express terms of the contract, the plaintiff could not state a claim for breach of the implied covenant and it granted the manufacturer's motion to dismiss.

Here, likewise, Nissan acted in accordance with the express terms of the Dealer Agreement, as well as the KMVA, when it withheld its approval for the proposed transfer of the dealership.  [Dealer Agreement, R. 14-3 at ¶ 15.A]; KRS § 190.070(2).  Epps has set forth no factual allegations to make it plausible that Nissan acted in bad faith in terminating the agreement or in withholding its approval of the transfer proposal.  For the same reasons as those stated for the dismissal of its breach of contract claim, Epps' claim for breach of the implied covenant of good faith and fair dealing must also be dismissed.

## B

Nissan next argues that Epps' claims for intentional interference with contractual relations and intentional interference with a prospective economic advantage must be dismissed.

16

This is because, Nissan claims, it has a legally protected right to approve or deny any transfer and because Epps' Asset Purchase Agreement was expressly contingent on Nissan's approval.

To recover for a claim for intentional interference with contractual relations, a plaintiff must establish the following elements:

> (1) the existence of a contract; (2) Defendants' knowledge of this contract; (3) that it intended to cause its breach; (4) its conduct caused the breach; (5) this breach resulted in damages to [the plaintiff]; and (6) Defendant had no privilege or justification to excuse its conduct.

*CMI, Inc. v. Intoximeters, Inc*., 918 F. Supp. 1068, 1079 (W.D. Ky. 1995); *see also Hunt*, 18 F. Supp. 2d at 702-703 (citing *Blair v. Gen. Motors Corp.*, 838 F. Supp. 1196, 1200 (W.D. Ky. 1993)) (internal quotation marks omitted) ("In order to prove a claim for tortious interference, [a plaintiff] must demonstrate that a wrongdoer intentionally meddled with an agreement without justification or invaded contractual relations by engaging in significantly wrongful conduct."). However, as an affirmative defense, a defendant "may escape liability by showing that he acted in good faith to assert a legally protected interest of [its] own." *NCAA v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988).  Kentucky courts have consistently held that a conduct within the scope of a contractual agreement cannot form the basis for an intentional interference claim.  *E.g*., *Hunt*, 18 F. Supp. 2d at 702; *Hornung*, 754 S.W.2d at 860 (holding that defendant's decision to decline to approve and hire the plaintiff as a broadcaster was a bargained-for right that was an essential element of the contract, so defendant "entitled to assert its right even to the detriment of [plaintiff's] prospective contractual relation"); *cf. Blair,* 838 F. Supp. at 1200 ("[A] claim of tortious interference should not [lie] where [a manufacturer in a dealership agreement] is asserting legitimate contract rights.").

Again, in *Hunt*, the plaintiff-franchisee entered into a dealership agreement, which provided that the manufacturer, John Deere, had the right to disapprove of any proposed transfer

17

or assignment. *Hunt*, 18 F. Supp. 2d at 699.  The plaintiff negotiated a sale and assignment to a third party, which Deere declined to approve.  After the plaintiff subsequently failed to meet satisfactory performance requirements, Deere issued a Notice of Termination, and the plaintiff filed suit.  The Court granted Deere's motion to dismiss plaintiff's tortious interference claim. Deere's contractual "right to withhold its consent for the sale of [the] dealership was bargained for an essential part of the contract between the parties," so the plaintiff could not state a claim for improper interference. *Id.* at 703.

The same conclusion applies here.  The contract, the KMVA, and even the Epps-Short proposed Asset Purchase Agreement contemplate that Nissan has a legally protected interest that precludes a claim for intentional interference with contract and with prospective business relations.  The Dealer Agreement specifically provides that Nissan may withhold its consent for the assignment or transfer of the dealership.  [Dealer Agreement, R. 14-3 at ¶ 15.A].  The KMVA similarly contemplates that a manufacturer's consent is a condition precedent to any proposed transfer or assignment.  KRS § 190.070(2)(c) ("There shall not be a transfer or assignment of the dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld."). In recognition of these provisions, the Asset Purchase Agreement between Epps and Short itself is expressly contingent on Nissan's approval.  [Asset Purchase Agreement, R. 14-2 at § 4.a].  Nissan had a protected legal interest and a bargained-for right to evaluate and withhold its consent to any proposed transfer.  It was therefore entitled to assert that right even to the detriment of Epps' prospective contractual relation.  *Hunt*, 18 F. Supp. 2d at 703; *Hornung*, 754 S.W.2d at 860.  Even accepting Epps' allegations as true, in light of this case law, it cannot be reasonably inferred that Nissan

intentionally interfered with Epps' contract or business relations, and these claims must be dismissed.

C

Nissan next challenges Epps' claim under the federal Automobile Dealers Day in Court Act on the ground that the complaint does not contain sufficient facts to constitute "coercion" within the meaning of that statute.  The ADDCA imposes upon manufacturers a duty "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise . . . ."  15 U.S.C. § 1222.  However, the ADDCA narrowly defines this good faith duty as "the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party. . . ."  15 U.S.C. § 1221(e).  The Sixth Circuit has long interpreted this statute to mean that, "in the absence of coercion, intimidation, or threats thereof, there can be no recovery [for a dealer] through the day-in-court statute, . . . even if the manufacturer otherwise acted in 'bad faith' as that term is normally used."  *Fray Chevrolet Sales, Inc. v. Gen. Motors Corp*., 536 F.2d 683, 685 (6th Cir. 1976) (citations and internal quotation marks omitted) (collecting cases); *Hall v. Ford Motor Co*., 1995 U.S. App. LEXIS 35405 (6th Cir. 1995) (unpublished). Coercion or intimidation is only actionable if it includes a "wrongful demand which will result in sanctions if not complied with," or if a manufacturer offers to the dealer an "either-or" proposition. *Fray*, 536 F.2d at 685 (citations omitted).  "The conduct must be such as would threaten a reasonable man in the dealer's position." *Overseas Motors, Inc. v. Import Motors, Ltd*., 375 F. Supp. 499, 544 (E.D. Mich. 1974).  "It is not sufficient that a dealer "mere[ly] . . . felt [itself] coerced." *Fray*, 536 F.2d at 685 (citations omitted).

19

Here, Epps has not set forth sufficient facts to make it plausible that Nissan's conduct rises to this level.  Nowhere does the complaint allege that Nissan rendered an ultimatum to Epps or affirmatively undertook to intimidate the dealership.  Epps cites *GMC v. New A.C. Chevrolet*, 263 F.3d 296, 326 (3d Cir. 2001), in which the Third Circuit explained that a manufacturer cannot shield itself from ADDCA liability by claiming it was merely enforcing a term of the contract; instead, a manufacturer can be liable if its acts with a pretextual, ulterior motive.  *Id.* at 327.  But even under that standard, Epps' complaint – unlike that in *New A.C.*, which expressly alleged in its complaint that the manufacturer had a "hidden agenda," *id.* at 328 – sets forth no allegation that Nissan's termination and resulting decision to discontinue consideration of the transfer was based on mere pretext.  At most, Epps alleges that it did not file a protest in reliance on the alleged representations of Starke, Nissan's representative.  But it cannot be said that these largely innocuous statements, even if accepted as true, coerced or threatened Epps to such an extent that it had no option but to yield.  *See Fray*, 536 F.2d at 685.  Because it cannot be reasonably inferred that Nissan coerced or threatened Epps in violation of the ADDCA, this claim must also be dismissed.

D

Finally, Nissan challenges Epps' fraud, fraud by omission, and negligent misrepresentation claims.  Fraud, or intentional misrepresentation, requires proof of six elements in Kentucky:

> (1) that the declarant (the defendant or its agent) made a material representation to the plaintiff; (2) that this representation was false; (3) that the declarant knew the representation was false or made it with reckless disregard for its truth or falsity; (4) that the declarant intended to induce the plaintiff to act upon the misrepresentation; (5) that the plaintiff reasonably relied upon the misrepresentation; and (6) that the misrepresentation caused injury to the plaintiff.

*Republic Bank & Trust Co. v. Bear,* 707 F. Supp. 2d 702, 708, 2010 U.S. Dist. LEXIS 36365, 7

20

(W.D. Ky. 2010) (citing *Flegles, Inc. v. TruServ Corp.,* 289 S.W.3d 544, 549 (Ky. 2009)).

Similarly, to state a claim for negligent misrepresentation:

> Kentucky follows the Restatement in holding liable for pecuniary loss a
> person who, (1) in the course of his business or a transaction in which he has
> a pecuniary interest, (2) supplies false information for the guidance of others
> in their business transactions, if (3) he fails to exercise reasonable care or
> competence in obtaining or communicating the information and (4) the
> plaintiff justifiably relied on the information.

*Bear*, 707 F. Supp. 2d at 713-14 (citing *Presnell Constr. Managers, Inc. v. EH Constr., LLC,* 134

S.W.3d 575, 580 (Ky.  2004)).  Finally, a claim for fraud by omission requires the following

elements:

> (1) that the defendant made a false statement or concealed the truth; (2) about a
> material fact; (3) that the defendant knew his statement was not true; (4) that the
> defendant intended to deceive the plaintiff; (5) that the plaintiff relied on the
> deception; and (6) damages resulting from the deception.

*Scheck Mech. Corp. v. Borden, Inc*., 186 F. Supp. 2d 724, 733 (W.D. Ky. 2001) (citing *Ky.*

*Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d

755, 771 (W.D. Ky. 1998)).  Nissan argues that these three claims must be dismissed because,

among other arguments, Epps cannot, as a matter of law, plead sufficient facts to meet the

"reasonable reliance" requirement.

For each of these claims, reliance on the representation must be reasonable and

justifiable.  *Bear*, 707 F. Supp. 2d at 710 (stating that, in the fraud by omission context, "the

plaintiff's reliance must have been reasonable; he still must exercise common sense to protect

himself."); *Flegles*, 289 S.W.3d at 549 (same, for fraudulent misrepresentation); *Presnell*

*Constr*., 134 S.W.3d at 580 (citing Restatement (Second) of Torts § 552) (same, for negligent

misrepresentation).  The Kentucky Court of Appeals has specifically held that "as a matter of

law, a party may not rely on oral representations that conflict with written disclaimers to the

21

contrary which the complaining party earlier specifically acknowledged in writing . . . ."
*Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640-41 (Ky. Ct. App. 2003);
*see also Govaerts v. Suntec Indus.*, 2010 U.S. Dist. LEXIS 52467, *20-21, 2010 WL 2178517
(W.D. Ky. May 26, 2010) ("[W]here a contractual provision directly and
unambiguously contradicts the alleged misrepresentation, reliance on the misrepresentation is
unreasonable."); *Davis v. Siemens Med. Solutions USA, Inc.*, No. 3:04CV-195-MO, 2007 U.S.
Dist. LEXIS 15904, 2007 WL 710133, at *4 (W.D. Ky. Mar. 6, 2007). Moreover, "[a] plaintiff's
knowledge and experience are relevant to a determination of whether his reliance was
reasonable,"[7] so "the law imposes upon recipients of business representations a duty to exercise
common sense." *Flegles*, 289 S.W.3d at 549. This is because "[i]t is well established under
Kentucky law that equity will grant no relief to a complaining party who has means of
knowledge of the truth or falsity of representations." *Moore, Owen, Thomas & Co. v. Coffey,*
992 F.2d 1439, 1447 (6th Cir. 1993) (citations omitted).

Epps, a sophisticated business involved in a significant, long-term commercial
relationship, had a duty to exercise "ordinary vigilance and attention." *Mayo Arcade Corp. v.
Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. 1931). The Dealer Agreement specifically
provides that a proposed transfer does not "correct any [] deficiency" that may serve as grounds
for termination, nor can it "extend the effective date of termination specified in the [Notice of
Termination]." [Dealer Agreement, R. 15-3 at § 15.A and 15.C]. Moreover, the Notice of
Termination itself expressly states that it provides "formal notice of its intent to terminate the
Agreement," and included no indication that the notice was in any way inapplicable. [R. 14-1 at
1]. The plain terms of these long-established, written contract provisions preclude Epps, as a

---

[7] *Ky. Laborers Dist. Council*, 24 F.Supp.2d at 771 (citing *Vest v. Goode,* 209 S.W.2d 833, 836 (Ky. 1948)).

matter of law, from establishing the reasonable reliance prong of its fraud claims.  *E.g.*, *Rivermont Inn*, 113 S.W.3d at 640-41; *Govaerts*, 2010 U.S. Dist. LEXIS 52467 at *20-21.  Epps therefore cannot state a claim for intentional or negligent misrepresentation, nor can it state a claim for fraud by omission, and these claims must be dismissed.

III

Accordingly, for the foregoing reasons, it is hereby **ORDERED** as follows:

1.  Defendant Nissan North America's Motion to Dismiss [**R. 14**] is **GRANTED**;

2.  Plaintiff Epps' claims, except for its claim for breach of post-termination contract terms, are hereby **DISMISSED WITH PREJUDICE**;

3.  Epps' claim for breach of post-termination contract terms is **DISMISSED WITHOUT PREDJUDICE**;

4.  Epps' Motion for Leave to File a Sur-Reply [R. 23] is **GRANTED**; and

5.  In light of this Order and the representations made by Epps in the filing at Docket Entry 19, the initial Motion to Dismiss [R. 5], which was filed prior to the filing of the First Amended Complaint, is **DENIED as moot**.

This the 27th day of March, 2015.

**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**